LYCOMING–CLINTON COUNTY MENTAL HEALTH/MENTAL RE-TARDATION PROGRAM, Petitioner

v.

DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2005.

Decided Oct. 7, 2005.

_____

Charles F. Greevy, III, Williamsport, for petitioner.

Howard Ulan, Harrisburg, for respondent.

Denise L. Deiter, Jersey Shore, for intervenor.

BEFORE: COLINS, President Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Lycoming–Clinton County Mental Health/Mental Retardation Program (the County Agency) petitions for review of the September 28, 2004, order of the Department of Public Welfare (DPW) affirming the Administrative Law Judge's (ALJ) decision to direct the County Agency to provide mental retardation (MR) services to T.T. We also affirm.

In April 2002, T.T.'s parents filed an application with the County Agency requesting MR services on behalf of their nineteen-year-old son. After reviewing the evaluations of T.T. performed by Richard E. Dowell, Jr., Ph.D., which showed that T.T. had a full scale IQ score of 103, the County Agency concluded that the documentation collected was not sufficient to determine whether T.T. was eligible for MR services. The County Agency received an addendum from T.T.'s parents in July 2002 detailing the processing discrepancy between T.T.'s higher level reasoning and real world social interaction (lower level executive functioning). Subsequently, the County Agency notified T.T.'s parents that because T.T.'s IQ score of 103

was too high, he was not eligible for MR services. (Findings of Fact, Nos. 1–5.)

T.T.'s counsel requested that the County Agency reassess T.T.'s eligibility for MR services based on a subsequent evaluation performed by Dr. Dowell, and, in response, the County Agency recommended that T.T.'s parents obtain an independent opinion regarding T.T.'s functioning ability. After an evaluation performed by Dawn Hoffman, a licensed psychologist, showed that T.T. had a full scale IQ score of 89, the County Agency again notified T.T.'s parents that T.T. was not eligible for MR services because his full scale IQ score of 89 was too high. Counsel for T.T. then filed an administrative appeal to DPW requesting that T.T. be determined eligible for MR services. (Findings of Fact, Nos. 6–10.)

At the administrative hearing on February 10, 2004, both Dr. Dowell and Hoffman testified that T.T. has Prader–Willi Syndrome, Attention Deficit Disorder, a Learning Disorder Not Otherwise Specified, and Oppositional Defiant Disorder. (Findings of Fact, No. 11.)

In addition, Hoffman testified before the ALJ that most patients diagnosed with Prader–Willi Syndrome also have been diagnosed as being moderately mentally retarded. She also stated that T.T.'s adaptive behavioral skills are severely impaired and are clearly more consistent with those of an individual with moderate to severe mental retardation as opposed to those of an average nineteen-year-old. Nevertheless, Hoffman testified that she did not diagnose T.T. as being mentally retarded because his full scale IQ score was 89. (Findings of Fact, Nos. 12–15.)

Testifying on behalf of T.T., Dr. Dowell stated that, although T.T.'s full scale IQ score of 103 fell within the average range, there was a high level of variability between T.T.'s concrete, factual knowledge and his fluid/flexible mental processing test scores. Dr. Dowell testified that T.T.'s actual "real world" cognitive performance, or higher level executive/reasoning functions, fell within the borderline to impaired range, with a score of 73. Dr. Dowell also stated that T.T.'s score of 45 on the Vineland Adaptive Behavioral Scales fell within the impaired range with overall level of "real world" adaptation falling within the moderate range of MR. Dr. Dowell diagnosed T.T. with functional moderate mental retardation, and he opined that T.T. had the functional ability of a seven year old. (Findings of Fact, Nos. 16–21.)

The ALJ rejected Hoffman's opinion that T.T. could not be diagnosed with MR because of his IQ score. Instead, the ALJ accepted Dr. Dowell's opinion that, even with an IQ of 103, T.T. should be diagnosed as functionally moderately mentally retarded based on criteria unrelated to the full scale IQ score as set forth in 55 Pa. Code § 4210.101a. (Findings of Fact, No. 24.)

The County Agency filed a motion for reconsideration with DPW, and, by order dated September 28, 2004, DPW upheld the decision of the ALJ requiring the County Agency to provide MR services to T.T. The County Agency now petitions this court for review.[1]

The County Agency argues that DPW's use of criteria other than IQ was unwarranted in T.T.'s case where his 103 IQ rendered him automatically ineligible for MR support services based on criteria es-

---

1. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

tablished in 55 Pa.Code § 4210.101a(a).[2] The County Agency also argues that the ALJ erred in crediting Dr. Dowell's opinion, which used factors other than IQ score to diagnose T.T. with MR. In support of these arguments, the County Agency relies on the eligibility criteria for MR services, which provide in relevant part as follows:

§ 4210.101a. Clarification of eligibility determinations—statement of policy.

(a) The *essential feature* of mental retardation is *significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning* . . . .

(1) [S]ignificantly subaverage general intellectual functioning shall be determined by a standardized, individually administered, intelligence test in which the overall full scale IQ score of the test and of the verbal/performance scale IQ scores are at least two standard deviations below the mean taking into consideration the standard of error measurement for the test. The full scale IQ shall be determined by the verbal and performance IQ scores (*See Appendix A—DSM IV*).

(2) *Diagnosis of mental retardation is made by using the IQ score, adaptive functioning scores and clinical judgment when necessary.* Clinical judgment is defined as reviewing the person's test scores, social and medical history, overall functional abilities, and any related factors to make an eligibility determination. *Clinical judgment is used when test results alone cannot clearly determine eligibility.* . . . . *In cases when individuals display widely disparate skills* or achieve an IQ score close to 70, *clinical judgment should be exercised to determine eligibility for mental retardation services.*

. . . .

**Appendix A**

. . . .

*Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below* (approximately 2 standard deviations below the mean). . . . . When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than mathematically derived full-scale IQ, may more accurately reflect the person's learning abilities. *When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ can be misleading.*

*Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation.* Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular

---

**2.** For its part, DPW challenges the County Agency's right to question the DPW decision arguing that: (1) DPW based its decision on unreviewable credibility determinations; and (2) DPW has unfettered discretion to follow or not follow its policy on a case by case basis. We agree with DPW that we may not review the credibility determinations of a fact-finder. *See Arcurio v. Department of Public Welfare,* 125 Pa.Cmwlth. 557, 557 A.2d 1171 (1989). We also agree that 55 Pa.Code § 4210.101a is a statement of policy and not a regulation with the binding force and effect of law.

However, contrary to DPW's contention, this does not mean that DPW may escape review of its action by relying on a statement of policy alone. Where an agency applies a policy in a particular situation, the agency must be prepared to support its actions as if the policy statement had never been issued. *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 374 A.2d 671 (1977). Thus, DPW must justify its use of factors other than IQ to determine T.T.'s eligibility for MR services.

age group, socio-cultural background, and community setting....

55 Pa.Code § 4210.101a (emphasis added) (footnote omitted).

Based on its interpretation of the language of subsection (a) of the policy, the County Agency maintains that T.T. cannot be diagnosed as mentally retarded because eligibility for MR services requires an IQ below 70. Further, the County Agency asserts that, under subsection (a)(2) of the policy, MR can only be diagnosed if the full scale IQ is 70 or *slightly* higher *and* the low IQ is accompanied by limited adaptive functioning. The County Agency reasons that because T.T.'s IQ scores do not provide the initial and vital criteria for MR, consideration of adaptive functioning scores or clinical judgment is inappropriate.[3] Because the County Agency's argument fails to consider the *entire* policy,[4] we disagree with this interpretation of 55 Pa. Code § 4210.101a.

Section (a)(2) of the policy expressly requires that diagnosis of MR must be based on IQ score, *adaptive functioning scores*

*and clinical judgment when necessary.* 55 Pa.Code § 4210.101a(a)(2). Clinical judgment is necessary when, as here, *an individual displays widely disparate skills. Id.* Additionally, Appendix A of the policy explains that, when there is a marked discrepancy across an individual's performance and verbal scores, a mathematically derived full scale IQ score can be misleading. 55 Pa.Code § 4210.101a, Appendix A. Indeed, Appendix A provides that "impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation." *Id.*

Here, the ALJ determined that T.T.'s disparate skill levels, as evidenced by widely varying test scores, and T.T.'s low scores in adaptive functioning, made the use of clinical judgment necessary to diagnose T.T. (ALJ's op. at 10.) Considering the policy in its entirety, we conclude that DPW did not err in allowing consideration of factors other than IQ to determine T.T.'s eligibility for MR services.[5] In fact, the policy warns of the misleading nature of IQ scores under certain circumstances.

---

**3.** The County Agency focuses on the policy's use of the term "essential" as support for its position that T.T.'s 103 IQ score automatically renders him ineligible for MR services. (The County Agency's brief at 13.) The word "essential" is defined as something being "necessary ... indispensable ... important to the highest degree ... minimum, but fundamental to achievement of an end," Webster's Third New World Dictionary 777 (1993).

**4.** The rules of statutory construction provide that every statute shall be construed, if possible, to give effect to all its provisions so that no provision is "mere surplusage." Section 1921 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a); *Commonwealth v. Gilmour Manufacturing Co.*, 573 Pa. 143, 148, 822 A.2d 676, 679 (2003). Although we recognize that 55 Pa.Code § 4210.101a is a statement of policy and not a statute, we believe that the rules of statutory construction provide worthwhile guidance when determining

the proper construction of a statement of policy.

**5.** We also note that to rely *solely* on a full scale IQ score of 70 or below to diagnose MR would be inconsistent with the statutory definition of MR. MR is defined as "subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of one or more of the following: (1) maturation, (2) learning and (3) social adjustment." Section 102 of the Mental Health and Mental Retardation Act of 1966, Act of October 20, 1966, Special Sess., P.L. 96, 50 P.S. § 4102. Notably, the statutory definition of MR does not require a base IQ score to diagnose an individual as mentally retarded and, in fact, does not mention IQ.

Finally, we point out that the County Agency's actions when reviewing T.T.'s documentation undermine its own argument. The

The ALJ determined that this was such a case, and the credible testimony supports this determination.

Accordingly, we affirm.

## ORDER

AND NOW, this 7th day of October, 2005, the order of the Pennsylvania Department of Public Welfare, dated September 28, 2004, is hereby affirmed.

County Agency initially told T.T.'s parents that it lacked sufficient documentation to determine T.T.'s eligibility, even though the County Agency did receive documents including T.T's IQ score of 103. The County Agency continued to accept additional documents from T.T.'s parents before eventually informing them that T.T. was ineligible for MR services because his IQ was too high. (Findings of Fact, Nos. 2–3.) If DPW's policy requires an IQ score of 70 or below before MR services are available, as the County Agency argues, then the County Agency should have made its eligibility decision immediately based on the IQ score of 103 included in the initial documentation.