**NANCY HADLOCK'S FAMILY CHILD CARE HOME, Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Aug. 29, 2014.

Decided Sept. 23, 2014.

Publication Ordered Nov. 21, 2014.

Gery T. Nietupski, Erie, for petitioner.

Jeffrey P. Schmoyer, Senior Counsel, Pittsburgh, for respondent.

BEFORE: DAN PELLEGRINI, President Judge, PATRICIA A. McCULLOUGH, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY President Judge PELLEGRINI.

Nancy Hadlock's Family Child Care Home (Home) petitions for review of the final order of the Department of Public Welfare (DPW), Bureau of Hearings and Appeals (Bureau), adopting the recommendation of the DPW Administrative Law Judge (ALJ) upholding DPW's decision to revoke the Home's Certificate of Registration to operate a Family Child Day Care Home due to its violations of the Public Welfare Code (Code).[1] Finding no error, we affirm.

I.

The following facts are not in dispute. DPW issued the Home, a Family Child Day Care Home (FCDCH),[2] and its caregiver, Nancy Hadlock, a Certificate of Registration (Certificate) to operate from June 10, 2011, to June 10, 2013, which restricted "[t]he total number of children in care at any time" to six, not including

1. Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§ 101–1503.

2. An FCDCH is defined as a "home other than the child's own home, operated for profit or not-for-profit, in which child day care is provided at any one time to four, five or six children unrelated to the operator." 55 Pa. Code § 3290.4.

relatives of the caregiver.[3] (Certified Record [C.R.] Notice of Appeal, Ex. C–1.) On July 12, 2012, DPW's Office of Child Development and Early Learning sent a certification representative, Lisa Furis, to conduct an unannounced inspection of the Home, following which DPW issued a preliminary decision to revoke the Home's Certificate for conditions and regulatory violations constituting "gross incompetence, negligence, and misconduct in operating a facility." (Reproduced Record [R.R.] at 1a.)

Specifically, in an inspection summary attached to DPW's decision, DPW stated that the Home violated the following regulations applicable to FCDCHs: (1) 55 Pa. Code § 3290.31(b)[4] because a staff person under 18 years old was observed alone with four children on the second floor of the Home; (2) 55 Pa.Code § 3290.51[5] because 11 unrelated children were being cared for at the Home at one time; (3) 55 Pa.Code § 3290.191[6] and 55 Pa.Code § 3290.32(a)[7] because two staff persons who were observed performing child-care duties did not have records containing the necessary documents; and (4) 55 Pa.Code § 3290.101(a)[8] and 55 Pa.Code § 3290.111(c)[9] because four children were observed in an upstairs bedroom lacking age-appropriate play equipment, learning materials and developmental activities.

## II.

The Home appealed DPW's preliminary decision, contending that revocation of its Certificate was too harsh a penalty for its violations and arguing that, instead, DPW should have given the Home a provisional

---

3. Section 3290.4 of DPW's regulations defines "relative" as "[a] child, stepchild, grandchild or foster child." 55 Pa.Code § 3290.4.

4. Section 3290.31(b) of the regulations requires, "Staff persons shall be 18 years of age or older." 55 Pa.Code § 3290.31(b). "Staff person" is further defined as "[a] person included in the regulatory ratio who is responsible for child care activities." 55 Pa.Code § 3290.4. Conversely, a "volunteer" is defined as "[a] person 16 years of age or older who is not included in the regulatory ratio. A volunteer assists in implementing daily program activities." *Id.*

5. Section 3290.51 of the regulations provides, "The number of children in care may not exceed six children at any one time who are unrelated to the operator." 55 Pa.Code § 3290.51.

6. As per Section 3290.191 of the regulations, "An individual record is required for each staff person." 55 Pa.Code § 3290.191. Records include the staff person's name, address, and telephone number, a report of health assessments, criminal-history information, child-abuse registry information, and records of training required by DPW. 55 Pa.Code § 3290.192.

7. Section 3290.32(a) of the regulations requires, "The operator shall comply with the CPSL and Chapter 3490 (relating to protective services)." 55 Pa.Code § 3290.32(a). Among other goals, the Child Protective Services Law, or CPSL, 23 Pa.C.S. §§ 6301–6386, seeks to "encourage more complete reporting of suspected child abuse" and to "establish in each county protective services for the purpose of investigating the reports swiftly and competently, providing protection for children from further abuse and providing rehabilitative services for children and parents involved." 23 Pa.C.S. § 6302(b).

8. Section 3290.101(a) of the regulations mandates, "Play equipment and materials appropriate to the developmental needs, individual interests and ages of the children shall be provided in sufficient amount and variety to preclude long waits for use." 55 Pa.Code § 3290.101(a).

9. Section 3290.111(c) of the regulations provides, "Daily activities shall promote the development of skills, social competence and self-esteem. Daily experiences shall recognize the child as an individual and give some choice of activities that respect personal privacy, life-style and cultural background." 55 Pa.Code § 3290.111(c).

license and afforded it the opportunity to correct its violations in accordance with the Plan of Corrections it filed with DPW.

At the hearing before the ALJ, DPW presented the testimony of Ms. Furis, who stated that in her capacity as a certification representative, she inspects FCDCHs, investigates complaints and executes the corresponding paperwork. She testified that on July 12, 2012, pursuant to complaints DPW received about the Home, she conducted an unannounced inspection.

She stated that as she approached the entrance, a woman arrived at the Home and picked up her daughter, Mikayla, and her belongings. Upon entering the Home, Ms. Furis observed eight additional children, four of whom Ms. Hadlock identified as her grandchildren, on the first floor. According to Ms. Furis, when she asked Ms. Hadlock to identify the children currently under her care, she identified only the children on the first floor. Ms. Furis and Ms. Hadlock proceeded outside to inspect a play space, at which time an 18 year-old female named Kaitlyn, who Ms. Hadlock identified as her "helper," arrived. (R.R. at 16a.) While outside, Ms. Furis observed two additional children, McKenna and Nathan, in a wooded area on the edge of the Home's property. She stated that when she asked McKenna who was caring for her, McKenna identified Ms. Hadlock. Ms. Furis observed Kaitlyn escort Nathan inside and later observed McKenna enter the Home.

Ms. Furis testified that after returning inside, she overheard a child question whether another child had gone upstairs and, as such, requested to view the upstairs rooms. As Ms. Hadlock opened the door to an upstairs bedroom, Ms. Furis stated that she observed a 16 year-old staff person, Stephanie, and three children exit the room while an infant remained in a mobile crib inside the room. She further stated that with the exception of a portable crib and baby monitor, the room was devoid of child-care equipment. According to Ms. Furis, at this point, Ms. Hadlock admitted that she had instructed Stephanie and the children to stay in the upstairs bedroom and that she had lied regarding the total number of children in her care. Ms. Hadlock explained to Ms. Furis that she did not intend to have so many children in her care that day but that a parent unexpectedly dropped off her children on the way to an interview.

Regarding the citations issued, Ms. Furis testified that under the relevant regulations, a minor cannot be alone caring for children. Second, she stated that the regulations prohibit the Home from caring for more than six unrelated children at a time and, in this case, at least 11 children, not including Ms. Hadlock's grandchildren, were in her care. Ms. Furis explained that another citation was issued because the Home did not have a complete record for either of its staff persons, Stephanie or Kaitlyn. The last two citations were issued because the appropriate equipment and program activities were absent from the upstairs bedroom, where four children were located. Ms. Furis testified that this information was included in the investigation summaries she completed and provided to her supervisor.

On cross-examination, Ms. Furis acknowledged that sanctions less severe than revocation exist, such as provisional certificates, but that such an option was not considered in this case. She explained that she issued a prior citation to the Home approximately 12 years ago, that the violation was corrected, and that DPW imposed no further sanctions in that matter.

Regarding 16 year-old Stephanie, Ms. Furis conceded that the regulations' definition of "volunteer" as opposed to a "staff

person" encompasses individuals aged 16 and older. She stated that she personally determined that Stephanie was a staff person as opposed to a volunteer because she was working alone upstairs. She further explained that as per the regulations, volunteers cannot be alone with children because they must be "supervised at all times by a staff person." Section 3290.31(c) of the regulations, 55 Pa.Code § 3290.31(c).[10] She was without knowledge regarding whether the Home compensated Stephanie for her services and agreed that the regulations require individual records only for staff persons, not for volunteers. Regarding the children upstairs, she admitted that she did not know what they were doing in the room as she only observed them exiting the room. She also noted that during five subsequent visits to the Home, an excessive number of children were not present, but other violations were observed.[11] DPW entered into evidence its preliminary decision along with Ms. Furis' inspection summaries.

The Home presented the testimony of Ms. Hadlock, who stated that occasionally, neighborhood children who are not under her care play on the Home's property and come inside the Home to visit. She testified that during the hour-long inspection, Ms. Furis asked her to identify the children for whom she was caring on the first floor, rather than throughout the entire Home, and that she did so without withholding any names.

Ms. Hadlock stated that she is familiar with DPW's regulations and follows them. Regarding the materials available, she explained that the Home has age-appropriate toys and materials for all of the children under her care. Regarding the four children in the upstairs bedroom, she testified that she neither instructed anyone to take them upstairs in an effort to hide them nor advised Ms. Furis that she had lied about the number of children in her care.

On cross-examination, Ms. Hadlock conceded that on the day in question, eight children, four of whom were her grandchildren, were located on the first floor when Ms. Furis entered the Home. She acknowledged that Mikayla had been in her care as well that afternoon but was picked up by her mother around the time Ms. Furis arrived. She agreed that the four children in the upstairs bedroom were under her care at that time in addition to McKenna and Nathan, who had been outside. She testified that she knew she had too many children in care as 11 children were under her supervision before Mikayla left. Ms. Hadlock admitted that she "knew [she] was over" when Ms. Furis arrived and did not advise Ms. Furis one way or the other regarding the children upstairs until Ms. Furis requested to view the upstairs rooms. (R.R. at 35a.) When asked if she admitted lying to Ms. Furis regarding the number of children in her care, Ms. Hadlock testified that she could not recall. She stated that Kaitlyn was not paid but was a volunteer and agreed that the Home did not have copies of Kaitlyn's required documents.

Likewise, Ms. Hadlock stated that Stephanie was an unpaid volunteer who had

---

10. "Supervise" is further defined as "[t]o be present in the child care facility with the children or with the facility person under supervision. Supervision is critical oversight in which the supervisor can see, hear, direct and assess the activity of the supervisee." Section 3290.4 of the regulations; 55 Pa.Code § 3290.4.

11. Ms. Furis testified that she observed the following violations during subsequent visits: (1) a large piece of wood with a protruding nail present in the parking lot; (2) a toy in a sleeping child's crib; and (3) spray cleaners on top of the refrigerator.

been assisting the children with art projects earlier that day. Ms. Hadlock explained that an infant under her care was not sleeping well downstairs, so she placed her in the mobile crib in the upstairs bedroom with a baby monitor and turned on the infant's favorite cartoon show to help her fall asleep. According to Ms. Hadlock, she asked Stephanie to check on the infant to ensure that she was not awake, and when Stephanie went upstairs, the other children "probably followed her up because they really weren't allowed to play up there." (R.R. at 36a.) Because the children did not normally play in that room, there was no equipment present except for the mobile crib, monitor and television. Ms. Hadlock stated that she expected Stephanie to return downstairs and agreed that she could not observe Stephanie or the children from downstairs.

Regarding the reason for the excessive number of children in Ms. Hadlock's care, she explained:

> Normally, McKenna and Rylon weren't there. McKenna normally wasn't there that summer—during the summer. Their plans changed. They came that day.

> Lila R.'s mother had been laid off and ended up with a job interview, popped in, and was there longer than supposed to be.

> McKenzie's grandparents dropped her off, and I had no clue she was coming. They dropped her off and left.

> Austin V.'s custody thing. When [m]om dropped him off in the morning, [d]ad was supposed to pick him up at 11:00. I had called his mom by 1:00 and said, "Guess what? He is not here. What's going on?" She had no clue.

> And Lila's mom was supposed to have been back quickly, got hung up with the job interview, and I wasn't expecting Rylon and McKenna that day, and I

wasn't expecting McKenna all summer. When we found out she wanted to stay, we adjusted and I made sure I no longer have several of the children. But being it was the first part of July, schools were done, they were still getting into summer schedules and it happened.

(R.R. at 38a.)

Following the hearing, the ALJ issued an adjudication recommending that the Home's appeal be denied because it was within DPW's discretion to revoke the Home's Certificate for the enumerated violations. Specifically, the ALJ noted that Ms. Hadlock admitting to exceeding the regulations' six-child maximum by five children, to leaving Stephanie unsupervised with four children in the upstairs bedroom during the inspection, and to failing to equip the upstairs bedroom with age-appropriate toys and materials, aside from a mobile crib and monitor.

While crediting Ms. Hadlock's explanation that she did not intend to violate the regulations' six-child maximum, the ALJ explained that her excuse did not negate the violation. The ALJ rejected Ms. Hadlock's testimony that she did not recall admitting to lying to Ms. Furis regarding the number of children present, reasoning: "She was aware of the regulations, knew she had children over the limit and deliberately tried to hide the fact from the inspector. This demonstrates misconduct in the operation of a facility." (10/24/13 ALJ Adjudication at 8.) The ALJ also noted that the Home "had either underage staff or an unsupervised volunteer caring for children alone in an upstairs bedroom." (*Id.*)

Moreover, the ALJ explained that DPW's revocation was legally proper because:

> any one of the proven violations would constitute sufficient grounds for the De-

partment to refuse to issue a license.... Therefore, DPW may revoke or not renew a license for a single violation. And in this case, the [Home]'s violation of 55 Pa.Code § 3290.51 is substantial evidence to support the Department's decision to revoke the [Home]'s Certificate of Registration to operate a Family Child Care Home.

(*Id.*)

The ALJ rejected the Home's argument that DPW should have issued a provisional certificate rather than revoking its Certificate, explaining that the Code does not authorize the issuance of a provisional certificate to an FCDCH. The Bureau adopted the ALJ's recommendation in its entirety by final administrative order and dismissed the Home's appeal.

### III.

On appeal, the Home argues that the decision to revoke its Certificate is not supported by substantial evidence [12] because DPW "utterly failed to demonstrate Hadlock's violation of the regulations," with the exception of Section 3290.51 of DPW's regulations, which the Home admits it violated. (Br. for Pet. at 14.)

Pursuant to Section 1079(b) of the Code, DPW "shall refuse to issue or renew a registration certificate or shall revoke a registration certificate" for several reasons, including "[n]oncompliance with department regulations" and "[g]ross in-

competence, negligence, or misconduct in operating the facility." 62 P.S. § 1079(b)(1), (4). Further, under the regulations applicable to FCDCHs, "[T]he Department may refuse to renew or may revoke a certificate of registration to an operator *for one or more of the following reasons:* (1) Noncompliance with the registration law or this chapter" and/or "(4) Gross incompetence, negligence or misconduct in operating the facility." 55 Pa. Code § 3290.12(c)(1), (4) (emphasis added).

 At the outset, we note that DPW may revoke a license for even a *single* violation of its regulations. *See* 55 Pa. Code § 3290.12(c); *Altagracia De Pena Family Day Care v. Department of Public Welfare,* 943 A.2d 353, 356 (Pa.Cmwlth. 2007) ("It is well settled that one regulatory violation is sufficient to revoke a license issued by DPW...."); *Pine Haven Residential Care Home v. Department of Public Welfare,* 99 Pa.Cmwlth. 1, 512 A.2d 59, 61 (1986) (explaining that a single violation which is supported by evidence constitutes a sufficient basis upon which DPW may refuse a license). Because the Home admits that it violated the regulations' six-child maximum, and because a single violation is sufficient to support revocation, we need not address the remaining violations. *See* 55 Pa.Code § 3290.51 ("The number of children in care may not exceed six children at any one time who are unrelated to the operator.").[13]

---

12. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. Evidence is "substantial" where "it so preponderates in favor of a conclusion that it outweighs, in the mind of the factfinder, any inconsistent evidence and reasonable inferences drawn therefrom." *York County Children & Youth Services v. De-*

*partment of Public Welfare,* 668 A.2d 185, 188 (Pa.Cmwlth.1995).

13. Regardless, a review of the record demonstrates that other violations are supported by substantial evidence. First, substantial evidence supports the finding that the Home violated DPW's regulation with regard to Stephanie. Ms. Hadlock admitted that sixteen-year-old Stephanie was upstairs, alone, with three children and an infant, in a bedroom from which Ms. Hadlock could not see Stephanie, let alone supervise her. Because Ste-

■ Next, the Home argues that the ALJ erred in determining that Ms. Hadlock lied to Ms. Furis regarding the number of children under her care on July 12, 2012, and that Ms. Hadlock "hid" some of the children upstairs during the inspection. Essentially, the Home asks us to accept its version of the facts over those offered by DPW. However, as we have stated time and time again, because "we may not review the credibility determinations of a fact-finder," we will not disturb this finding on appeal. *Lycoming–Clinton County Mental Health/Mental Retardation Program v. Department of Public Welfare,* 884 A.2d 382, 384 n. 2 (Pa.Cmwlth.2005). Crediting the testimony offered by Ms. Furis, substantial evidence supports the ALJ's finding that the Home engaged in misconduct in its operations in violation of

Section 1079(b)(4) of the Code and Section 3290.12(c)(4) of the regulations because Ms. Hadlock was aware of the six-child maximum, knew that more than six children were under her supervision, and deliberately attempted to conceal this fact from the inspector by lying about the number of children under her care and advising Stephanie to take four of the children, including an infant, upstairs. 62 P.S. § 1079(b)(4); 55 Pa.Code § 3290.12(c)(1), (4).

Finally, the Home asserts that revocation for a single violation is proper only where the violation is so serious that the children were threatened with harm. In support of this argument, the Home cites *Gibbs v. Department of Public Welfare,* 947 A.2d 233 (Pa.Cmwlth.2008), *appeal denied,* 600 Pa. 756, 966 A.2d 572 (2009) and

phanie was the sole person caring for the children in this regard, substantial evidence supports the conclusion that she was responsible for child care activities and functioning as a "staff person," in violation of Section 3290.31(b) of the regulations, which requires that staff persons be at least eighteen years old. 55 Pa.Code § 3290.31(b).

The Home urges us to accept its position that Stephanie was a volunteer rather than a staff person, relying upon Ms. Hadlock's testimony that Stephanie was not compensated for her services. However, the relevant inquiry is whether substantial evidence supports the ALJ's determination, not whether the record supports a contrary finding. *Ductmate Industries, Inc. v. Unemployment Compensation Board of Review,* 949 A.2d 338, 342 (Pa. Cmwlth.2008). Moreover, even if Stephanie were a volunteer, the Home still violated Section 3290.31(c) of the regulations, which requires volunteers to "be directly supervised at all times by a staff person." 55 Pa.Code § 3290.31(c). Because Ms. Hadlock admitted that she could not see, hear, direct, or assess Stephanie's supervision of the children while they were upstairs, substantial evidence supports the finding that she did not provide "critical oversight" in which she could "see, hear, direct and assess" Stephanie's activity. Section 3290.4 of the regulations, 55 Pa.Code § 3290.4.

Further, because substantial evidence supports the finding that Stephanie was functioning at the time in question as a staff person, and because Ms. Hadlock admitted that she was not in possession of Stephanie's individual record or supporting documents, there exists substantial evidence on which to base violations of Sections 3290.32(a) and 3290.191 of the regulations. 55 Pa.Code § 3290.32(a); 55 Pa.Code § 3290.191.

Additionally, Ms. Hadlock admitted that the upstairs bedroom lacked children's materials, except for a mobile crib, baby monitor, and television. Because the children were in the upstairs bedroom for the duration of the one-hour inspection, substantial evidence supports the finding that they were without appropriate play equipment and developmental materials during this time and endured "long waits for use" of the materials, in violation of the regulations. Section 3290.101(a) of the regulations, 55 Pa.Code § 3290.101(a). Likewise, by Ms. Hadlock's own testimony, the three children sat in the upstairs bedroom for an hour watching cartoons that an infant favored. As such, evidence was presented that at least for this hour, the three children in the room lacked exposure to activities which promoted development of their skills, social competence, and self-esteem. Section 3290.111(c) of the regulations; 55 Pa.Code § 3290.111(c).

*Altagracia De Pena Family Day Care v. Department of Public Welfare,* 943 A.2d 353 (Pa.Cmwlth.2007).

In *Gibbs,* we found that the caregiver of an FCDCH did not violate the Code when she delegated supervision of the children to an adult staff person who failed to watch them, resulting in a two-year-old child leaving the yard and crossing a street. *Gibbs,* 947 A.2d at 234, 237–38. We held that the operator did not engage in gross incompetence, negligence or misconduct simply by entrusting an adult employee with supervision for a short time when there was no evidence presented that the employee was known to be untrustworthy or unreliable, and we declined to hold the operator to a strict-liability standard. *Id.* at 238. Because we determined that *no* violation occurred in *Gibbs,* this case does not support the Home's position.

In *Altagracia De Pena Family Day Care,* DPW revoked an FCDCH's certificate to operate when its caregiver left the premises and entrusted supervision of the children to her two sons, both of whom were unqualified under the regulations to be caregivers, and a two-year-old wandered into the street. *Altagracia De Pena Family Day Care,* 943 A.2d at 355. The caregiver did not dispute that she violated Section 3290.113 of DPW's regulations but instead argued that equity required DPW to give her a provisional license because she took corrective action. *Id.* at 356. Noting that corrective action is irrelevant in determining whether a violation occurred and that the Code does not provide for provisional licenses for FCDCHs, we concluded that DPW did not err in refusing a provisional license and that its revocation was supported by substantial evidence. *Id.* at 356–57. Nowhere in that opinion did we state, expressly or impliedly, that where a single violation occurs, it will support revocation only if the viola-

tion is so serious that it threatened the children with harm. To the contrary, we stated without qualification that "[I]t is well settled that one regulatory violation is sufficient to revoke a license issued by DPW, or in this case, a registration certificate to operate a family day care home." *Id.* at 356.

As in *Altagracia De Pena Family Day Care,* here, the Home admits that it violated Section 3290.51 of DPW's regulations by providing care to 11 children, nearly twice as many children as authorized. 55 Pa.Code § 3290.51. Because this single violation, without more, supports DPW's revocation, we find no error in the Bureau's decision.

Accordingly, we affirm the Bureau's order adopting the ALJ's recommendation in its entirety.

## ORDER

AND NOW, this 23rd day of September, 2014, the order of the Department of Public Welfare, Bureau of Hearings and Appeals, dated October 31, 2013, at No. 018–12–0054, is affirmed.