# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tullis's Little Lamb Daycare,     :
                    Petitioner     :
                            :
           v.              :    No. 164 C.D. 2018
                            :    Argued: February 11, 2019
Department of Human Services,     :
                    Respondent     :

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE P. KEVIN BROBSON, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**           **FILED: March 6, 2019**

Tullis's Little Lamb Daycare (Daycare) petitions for review of the January 10, 2018 Order of the Department of Human Services (Department), Bureau of Hearings and Appeals (Bureau), which adopted the recommendation of an administrative law judge (ALJ) denying Daycare's appeal. The ALJ concluded the Department correctly revoked Daycare's first provisional certificate of compliance (Provisional Certificate) to operate a child care center based upon: multiple violations of Department regulations observed during various inspections, including some that were repeat violations; Daycare's failure to submit acceptable plans of correction and follow those that were submitted; and Daycare's gross negligence. Upon review, we affirm.

## I. Background

Daycare is a child care center in Johnstown, Pennsylvania, which operated for 12 years under a full certificate of compliance.[1] (Findings of Fact (FOF) ¶¶ 1-2, 10.) In May 2016, as Daycare's annual certificate of compliance was expiring, the Department performed a renewal inspection, which found numerous violations of Department regulations. (*Id.* ¶ 13; Exhibit (Ex.) C-1.) Although Daycare submitted a Plan of Correction (POC) for the May inspection, which was accepted by the Department, the Department issued Daycare the Provisional Certificate, which was valid for the six-month period from August 1, 2016, to February 1, 2017, instead of another full certificate of compliance, which is valid for one year.[2] (FOF ¶¶ 22, 25; Ex. C-3.) During the course of the next six months, the Department performed five more inspections, which revealed repeat violations, as well as new violations of Department regulations. As a result, the Department advised Daycare by letter dated January 4, 2017, that its Provisional Certificate was being revoked for failure to comply with Department regulations, in addition to failure to comply with acceptable POCs that were filed, failure to submit acceptable POCs for some inspections, and gross incompetence and negligence. (Ex. C-0.)

### A. ALJ Hearing

Daycare appealed the Department decision, and a hearing was scheduled before an ALJ. At the two-day hearing, Certification Supervisor and Certification

---

[1] "Child care center" is defined as "any premises operated for profit in which child care is provided simultaneously for seven or more children who are not relatives of the operator, except such centers operated under social service auspices." Section 1001 of the Human Services Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. § 1001.

[2] A provisional certificate of compliance is issued when there has been substantial but not complete compliance with the applicable regulations. (FOF ¶ 8.)

Representative testified on behalf of the Department, while Daycare's Director testified in Daycare's defense.

Certification Supervisor testified in pertinent part as follows.[3] He accompanied another certification representative who was completing her training on a renewal inspection at Daycare on May 18, 2016. (Hr'g Tr. at 13, 57.) During the inspection,[4] he noted that two staff members lacked clearances, which are important to ensure that no one with criminal histories are endangering the children. (*Id.* at 32-33.) Although Department regulations[5] require at least half the staff to be qualified as directors, group supervisors, or assistant group supervisors, seven of the eight staff members at Daycare qualified only as aides. (*Id.* at 36-37.) In addition, a staff member left another staff member alone in a room to supervise five children, one of whom was under a year old. As a result, Daycare violated regulations establishing a maximum staff:child ratio and requiring constant supervision. (*Id.* at 38-39, 46.) Certification Supervisor also observed heaters in the infant/toddler room that pulled away from the wall, creating a pinch/crush hazard, sharp edges on the covers to two poles, and screws protruding from a wall. (*Id.* at 42.) There was also peeling paint on baseboards in the infant/toddler room and on the wall by the kitchen door in the preschool/school age room. (*Id.* at 43.) Certification Supervisor witnessed numerous pieces of equipment and toys in disrepair, including a bouncy

---

[3] Certification Supervisor's testimony appears on pages 10 through 108 of the transcript.

[4] The Department cited 43 violations in its May 18, 2016 Licensing Inspection Summary (LIS), but at the hearing, counsel for the Department advised it was only proceeding on 13 of those violations. (ALJ Opinion (Op.) at 31.) The ALJ did not find the Department carried its burden as to all of those violations. Because the other violations are not at issue, we limit our discussion to only those violations that were sustained by the ALJ.

[5] For ease of reading and because the parties do not dispute which regulations are at issue, we omit the Pennsylvania Code citation for each specific regulation violated, opting instead to refer to the subject matter of the regulations, generally.

seat with a hole in it, a swing that was not stable, a table that was cracked and had rough edges, a swing and playhouse outside that was cracked and created a pinch/crush hazard, a bench missing its seat and was sharp and rusty, a plastic rocker with sharp edges, and a swing set with exposed bolts. (*Id.* at 44.) During the inspection, a staff member was unaware a child went to the bathroom alone. (*Id.* at 47.) A review of the records revealed a lack of: documentation to support tuberculosis screenings for two staff members; a current health assessment for one staff member, and an initial health report for another; and evidence of mandatory reporter training, written references, and verification of child care experience for some staff. (*Id.* at 49-54.) On cross-examination, Certification Supervisor agreed that Daycare submitted an acceptable POC to address the deficiencies. (*Id.* at 71-72.) On redirect examination, he explained that an acceptable POC is just a proposed remedial plan; whether Daycare actually corrected the deficiencies would be verified during a subsequent inspection. (*Id.* at 98-100.)

Certification Representative testified as follows.[6] She performed the subsequent inspections of Daycare beginning with an onsite inspection on July 19, 2016,[7] the purpose of which was to verify correction of the deficiencies found during the earlier visit. (*Id.* at 113.) During this inspection, Certification Representative found repeat violations related to lack of clearances, insufficient staff present who were qualified as directors, group supervisors, or assistant group supervisors, staff:child ratios, lack of supervision, and lack of verification of child care experience. (*Id.* at 115, 117-18, 120-21, 126-27.) In addition, Certification

---

[6] Certification Representative's testimony appears on pages 112 through 209 of the transcript.

[7] According to the LIS, 25 violations were cited during the July 19, 2016 inspection. The Department proceeded at the hearing on 10 of those violations, 2 of which the ALJ found were not properly cited. As before, we limit our discussion to the substantiated violations.

4

Representative cited Daycare for unsupervised aides and peeling paint on a water pipe cover in the infant room. (*Id.* at 119, 122.)

On August 30, 2016, Certification Representative performed an allocated unannounced inspection of Daycare and cited Daycare with nine violations.[8] Several of the violations were considered repeat violations, such as lack of clearances[9] and insufficient staff present qualified as directors, group supervisors, or assistant group supervisors. (*Id.* at 155-56.) Certification Representative also cited Daycare for a number of staff members who were lacking qualifications for the positions they were performing, including one staff member who identified herself as an assistant group supervisor despite a lack of qualifications for the position. (*Id.* at 155-57.) Daycare also was cited for having no staff trained in first aid, unsupervised aides, no individual records for two staff members, and issues with documentation involving other staff members. (*Id.* at 157-60.) Finally, Certification Representative cited Daycare after she observed staff leave four children, ages 3 to 5 years old, alone. (*Id.* at 158.) During this inspection, Certification Representative met with Daycare's Owner and Director to discuss the violations. (*Id.* at 160.) Following the August inspection, Daycare did not submit a POC, which prompted Certification Representative to send two notices – one in September and one in November 2016 – requesting POCs. (Exs. C-5, C-6.) None were submitted.

---

[8] Certification Representative explained that they are to perform at least 10 unannounced visits of facilities per year of their choosing. These are considered allocated inspections. (Hr'g Tr. at 154.)

[9] Certification Representative testified that at least part of this offense was considered a repeat because it involved missing clearances for the same staff members as before. However, there were also different staff members discovered without the appropriate clearances in the August 2016 unannounced inspection. (Hr'g Tr. at 154-55.)

Certification Representative performed another unannounced monitoring inspection on November 8, 2016.[10, 11] (Hr'g Tr. at 172.) Upon a review of Daycare's records, Certification Representative discovered the file for one staff person was missing a full FBI clearance and a signed disclosure statement. (*Id.*) Certification Representative also witnessed a staff member who was supervising two infants and one toddler leave the infants alone while she took the toddler to the restroom. (*Id.* at 174.) She also observed one staff member leave another staff member alone with seven children, including a young toddler, which violated the staff:child ratio. (*Id.* at 175.) In addition, Daycare was cited for lacking health assessments for two staff members. (*Id.* at 176-77.)

Lastly, on December 19, 2016, Certification Representative conducted both a complaint inspection and an unannounced monitoring inspection at Daycare.[12] During the inspection, Certification Representative witnessed a staff member leave nine children – two young toddlers, five preschool-aged children, and two school-aged children – alone on three occasions while the staff member left Daycare to get other children off the bus. (*Id.* at 196-98.) She also observed a staff member leave an infant sleeping in a bouncy seat and another crawling on the floor while she changed the diaper of a third infant in a part of the room where she could not see the

---

[10] In the interim, Certification Representative testified that she conducted an unannounced monitoring inspection on September 6, 2016, at which one violation was cited. (Hr'g Tr. at 169.) Because the ALJ found the citation was not supported by the evidence, we need not consider it.

[11] The Department proceeded at the hearing on only 5 of the 13 violations cited in the LIS for the November inspection, all 5 of which were sustained by the ALJ. Accordingly, we limit our discussion to those violations.

[12] A separate LIS was issued for each of these inspections. The LIS for the complaint inspection listed one violation being cited, which was found properly cited by the ALJ. (Ex. C-10.) The LIS for the unannounced monitoring inspection listed 11 violations, but the Department pursued only 3 of those violations at the hearing, 2 of which were found to be properly cited by the ALJ. (Ex. C-11.) Again, we limit our discussion to those violations sustained by the ALJ.

6

two infants. (*Id.* at 199.) Certification Representative further testified that a young toddler left a classroom and was headed towards the door of Daycare when a 7- or 8-year-old child went after the toddler and brought him back to the classroom. (*Id.*) Daycare was also cited for having no staff designated as responsible in the director's absence and for leaving a 4-month-old infant sleeping in a bouncy seat, which did not comply with the sleeping position recommended by the American Academy of Pediatrics and required by Department regulations. (*Id.* at 203, 206.)

Daycare's Director testified as follows.[13] He is responsible for overseeing Daycare's day-to-day operations and supervising its staff. (*Id.* at 224.) Regarding the violations related to having at least half the staff qualified as directors, group supervisors, or assistant group supervisors, he testified that prior inspectors certified some of those staff members as assistant group supervisors. (*Id.* at 232-33, 261.) He further testified that he believed the staff members were qualified for their positions, but when asked if there was documentation in their files to support this, he responded "[a]pparently not." (*Id.* at 282-84.) As for the violations related to the lack of verification of child care experience, education, and training, Director claimed that he was unaware some staff needed verification of experience because the prior inspectors certified those staff members. (*Id.* at 252-53.) He admitted the violation from the July inspection that those staff members lacked verification of child care experience, education, and training. (*Id.* at 279.) He also testified that two staff members had first aid training, but again he was not sure if there was documentation to that effect. (*Id.* at 283-84.) Director accepted responsibility for not maintaining proper documentation, such as clearances and health assessments,

---

[13] Director testified on the second day of the hearing. The transcript of the hearing is consecutively paginated. Director's testimony appears on pages 222 through 310 of the transcript.

7

stating he should have followed up to acquire new documentation upon its expiration. (*Id.* at 230, 252, 297.)

Director admitted he was not present for any of the incidents where staff members allegedly left children either completely alone or with just one other staff member, but found the allegations "hard to believe" and stated he was "not so sure about the credibility of some of the inspectors" but had to accept the allegations at "face value." (*Id.* at 234-35, 285, 290-91, 294-95.) He further testified that staff have been counseled that such behavior is not acceptable and additional staff have been scheduled to avoid such incidents from occurring again. (*Id.* at 234, 292.) He disputed that two infants were left alone while a staff member changed another infant's diaper, explaining that there is a short wall separating the two spaces, but it has always been considered the same room. (*Id.* at 295.) Director also disputed that the heaters were loose and introduced photographs depicting the heaters in support.[14] (*Id.* at 237-38.) On cross-examination, he acknowledged that he prepared the POC which stated that heaters had been "repaired," but stated he meant "inspected" as there was nothing wrong with them. (*Id.* at 257-58.) Concerning the allegations of the premises or equipment being in disrepair, Director testified those items had been repaired, replaced, removed, or repainted or were in areas that were not used by any children. (*Id.* at 242-43, 246-48, 269-71, 277-78.) According to Director, several of the staff members who were involved in the various citations are no longer employed at Daycare. (*Id.* at 248-52, 281.) On cross-examination, Director acknowledged that Daycare has been subject to the same regulations for 12 years, but stated there were "different interpretations of those rules." (*Id.* at 254.)

---

[14] The Department objected to the admission of the photographs as they were not disclosed on the Unified Prehearing Filing. The ALJ reserved ruling on the objection but ultimately admitted the photographs. (Hr'g Tr. at 238-40; ALJ Op. at 34.)

8

B.    ALJ Decision

Based upon the testimony and evidence presented, the ALJ recommended Daycare's appeal be denied. In doing so, the ALJ found the Department carried its burden of proving 10 of the 13 violations it pursued from the May inspection, 8 of the 10 violations it pursued from the July inspection, all 9 of the violations it pursued from the August inspection, all 5 of the violations it pursued from the November inspection, and 3 of the 4 violations it pursued from the December inspections. The ALJ noted that Director did not dispute that certain required documentation was lacking and accepted fault for not tracking documentation more carefully. (ALJ Opinion (Op.) at 32, 37-38, 40-43, 45.) The ALJ found it did not matter that staff were no longer employed at Daycare or that the required documentation was subsequently provided because what mattered for purposes of determining a violation was whether there was compliance at the time of inspection. (*Id.* at 37.) To the extent Director claimed one staff member was not working and therefore did not need verification, the ALJ rejected this testimony as self-serving and vague as to the time she stopped working in relation to the citation, and instead credited the testimony of Certification Representative that she saw the staff member's name on a work schedule posted on the wall. (*Id.* at 44.) The ALJ rejected Director's claim that prior inspectors certified certain staff as assistant group supervisors, finding Director's testimony not credible. (*Id.* at 32, 38.) The ALJ stated that "[e]ven if [Director] sincerely believed some of these staff persons [were] qualified . . . he was put on notice after [the May inspection] that they [were] not." (*Id.* at 38.) Thus, the ALJ concluded "[i]t was unreasonable for him to continue to believe these staff persons met the criteria for assistant group supervisors at the time of the July 19, 2016 inspection." (*Id.*) The ALJ concluded there was evidence to support the

9

citation for failure to designate a staff person to be responsible in the director's absence, citing for support Director's testimony that he forgot that day. (*Id.* at 46.)

The ALJ expressly credited the testimony of Certification Supervisor and Certification Representative. Based upon that credited testimony, the ALJ found Daycare was out of compliance with staff:child ratios, and as a result, did not provide adequate supervision, on a number of occasions. (FOF ¶¶ 65-66; ALJ Op. at 33, 39, 45.) The ALJ further noted that although Director did not observe incidents of children being left alone, leaving the classroom by themselves to use the restroom, attempting to leave the premises only to be stopped by another child, and being placed in a non-recommended sleep position, the credited testimony of the Department's witnesses supports these violations. (ALJ Op. at 36, 42, 45-47.) Furthermore, the ALJ found that although a staff person may have been physically in the same room as two infants when changing a third infant's diaper, "[a] staff person may be in the same room as a child, but not supervising them" and it was supervision that was required. (*Id.* at 46.) Concerning the heater, the ALJ found it was loose from the wall and noted that Director's testimony that the covers were not loose "directly contradicts [with] what [Director] wrote in his POC." (*Id.* at 34.) As for the photographs Director introduced, the ALJ found that photos were taken head-on rather than from the side; thus, they were given "very little weight." (*Id.*) The ALJ also found Director's testimony about the wall heaters as inconsistent with Certification Supervisor's credited testimony that he found crayons behind the metal covers. (*Id.*) Related to the violation that the premises was not in good repair or had peeling paint, the ALJ found that although the areas were not used by any children, they were considered licensed space, which could have been used, and the regulations require the premises to be in good condition regardless of whether

10

children access those areas. (*Id.* at 35, 39.) Whether the items were out of compliance for several years without being cited or were repaired is immaterial, the ALJ found. (*Id.* at 35.) The ALJ similarly sustained the violation involving equipment that was in disrepair, noting that Director "did not dispute [Certification Supervisor]'s testimony about this violation and testified only that whatever was cited was subsequently corrected, replaced, or repaired." (*Id.* at 35-36.)

> The ALJ noted that just one violation is enough to revoke a license, but here:

> the ALJ found violations of **twelve** different regulations listed in the May 18, 2016 [Licensing Inspection Summary (LIS)] were properly cited; violations of **eight** different regulations listed in the July 19, 2016 LIS were properly cited; violations of **nine** different regulations listed in the August 30, 2016 LIS were properly cited; violations of **five** different regulations in the November 8, 2016 LIS were properly cited; and violations of **three** different regulations listed in the December 19, 2016 LISs were properly cited.

(*Id.* at 47 (emphasis in original).)

The ALJ also found that Daycare failed to submit acceptable POCs to correct the noncompliant items cited. While Daycare did submit acceptable POCs for the May, July, and September inspections, it did not submit any for the August, November, or December inspections. (*Id.* at 48.)

The ALJ further found that Daycare did not comply with the POCs that were accepted. For instance, the ALJ noted that Daycare was cited in May for staff health assessments and indicated in its POC that staff would comply in the future, but Daycare was cited again for the same violation in November. (*Id.* at 49.) The ALJ found Daycare was cited in May and July for violations related to staff qualifications and submitted POCs stating it would comply moving forward, but was cited again in August. (*Id.*) The ALJ similarly found Daycare submitted POCs to address

11

violations related to supervision of aides and clearances, but did not comply, as evidenced by Daycare being cited again for the same violations. (*Id.*) Finally, the ALJ found that Daycare "repeatedly failed to comply with its POCs with regards to" violations related to staff:child ratios and supervision of children. (*Id.* at 50.) Based upon Daycare's failure to comply with the acceptable POCs, the ALJ found Department revocation of the Provisional Certificate proper.

In addition, the ALJ found Daycare was grossly negligent in its operations, noting that "[i]n this adjudication, the ALJ has found **multiple** violations of **multiple** regulations," many of which were cited two to five times each. (*Id.* at 51 (emphasis in original).) The ALJ stated it was "not only the number of properly cited violations" that was troubling, "but also the fact that several of them relate to the same issue" – namely Daycare's failure to properly supervise children, which was "[o]ne of the basic functions of a child day care center." (*Id.*) The ALJ continued that "[e]ven more egregious is the fact that [Daycare] committed these violations **after it submitted multiple plans of correction** indicating it would always remain in ratio and properly supervise children." (*Id.* (emphasis in original).) According to the ALJ, "[t]here is a clear pattern of [Daycare] failing to properly supervise children and adhere to mandatory ratios, even after it pledged to do so," and "[t]his pattern . . . constitutes gross negligence." (*Id.*) Furthermore, the ALJ found "that several of the violations pertain to 'high risk' issues, including supervision, staff:child ratio, and compliance with the [Child Protective Services Law (CPSL), 23 Pa. C.S. §§ 6301-6386]." (ALJ Op. at 51.)

In conclusion, the ALJ rejected various arguments Daycare made in its defense. As for Daycare's argument that it was in a high-crime area, the ALJ stated this did not excuse its compliance with the regulations. (*Id.* at 52.) The ALJ also

12

rejected Daycare's argument that the violations were relatively minor or de minimis and that Daycare was in substantial compliance. (*Id.*) Nor did the ALJ find that the Department was required to issue a second provisional license, as Daycare contended. (*Id.*)

Based upon the findings, the ALJ recommended Daycare's appeal be denied. (*Id.* at 53.) By Order dated January 10, 2018, the Bureau adopted the ALJ's recommendation in its entirety. Daycare challenges this Order in its Petition for Review.

## II. Discussion

On appeal,[15] Daycare argues the Department erred in revoking its Provisional Certificate. It maintains some of the regulatory violations are incorrect and not supported by substantial evidence. It further argues it substantially complied with the regulations, and some infractions were minor. Daycare contends the Department should have exercised its discretion and issued a second provisional license, instead of revoking Daycare's first one.[16] It asks the Court to reverse the Order.

The Department responds that there is substantial evidence to support its revocation of the Provisional Certificate including Daycare's 37 violations of

[15] On appeal, our "review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether necessary findings of fact are supported by substantial evidence." *Nancy Hadlock's Family Child Care Home v. Dep't of Pub. Welfare*, 103 A.3d 851, 857 n.12 (Pa. Cmwlth. 2014).

[16] Daycare also contends that Certification Representative "has a personal animus towards [Daycare's] continued operation." (Daycare's Brief at 10.) The heading of Daycare's argument section in its brief alleges the revocation of Daycare's Provisional Certificate "was motivated by racial discrimination." (*Id.* at 9.) Daycare does not develop the argument further. Nor does the Court see where Daycare asserted discrimination previously. Therefore, because the argument is neither developed nor properly preserved, we will not address this argument. *B.E. v. Dep't of Pub. Welfare*, 654 A.2d 290, 292 (Pa. Cmwlth. 1995).

13

regulations, failure to submit acceptable POCs as required, failure to comply with acceptable POCs, and gross negligence in operating the facility. The Department notes that the Court cannot reverse the ALJ's findings of fact or credibility determinations. It argues Daycare was not eligible for a second provisional certificate because it was not in substantial compliance with the regulations. Further, the Department argues 37 violations are not de minimis, and even if they were corrected, they could still serve as a basis for revocation. The Department asks the Court to affirm the Order.

Pursuant to Section 1026(b)(1), (4) of the Human Services Code (Code), "[t]he [D]epartment . . . shall revoke a license for . . . [v]iolation of or non-compliance with the provisions of this act or of regulations pursuant thereto[,]" or for "[gr]oss . . . negligence." 62 P.S. § 1026(b)(1), (4). This Court has previously held that even one violation of the Department's regulations is sufficient to justify revocation of a license. *Nancy Hadlock's Family Child Care Home v. Dep't of Pub. Welfare*, 103 A.3d 851, 857 (Pa. Cmwlth. 2014); *Altagracia De Pena Family Day Care v. Dep't of Pub. Welfare*, 943 A.2d 353, 356 (Pa. Cmwlth. 2007). Here, Daycare admitted to several of the violations. For instance, Director admitted to a violation from the July inspection involving staff lacking verification of child care experience, education, and training. (Hr'g Tr. at 279.) In addition, Director admitted that he did not follow up to ensure staff had the proper clearances, the importance of which, Certification Supervisor explained, was to ensure that no staff with criminal histories were employed, which would endanger the children. (*Id.* at 34, 229.)

There is substantial evidence to support the ALJ's findings related to the other violations based upon the credited testimony of Certification Supervisor and Certification Representative, who personally observed the violations. We note that

14

for a majority of the violations, especially those dealing with the adequacy of the children's supervision, Director testified he was not present and, therefore, had no personal knowledge of the incidents. As a result, there was no evidence rebutting the testimony of the Department's witnesses. While the ALJ was free to reject this unrebutted evidence, the ALJ did not, and it was within the ALJ's province to do so. *Nancy Hadlock's Family Child Care Home*, 103 A.3d at 858.

Moreover, while Director disputed some of the allegations, such as the lack of properly qualified staff and whether the heater was loose from the wall, "the relevant inquiry is whether substantial evidence supports the ALJ's determination, not whether the record supports a contrary finding." *Id.* at 857 n.13. Director testified that prior inspectors certified certain staff as assistant group supervisors, but the ALJ did not credit that testimony. (Hr'g Tr. at 232-33; ALJ Op. at 38.) Nor did the ALJ credit Director's testimony that the wall heater was not loose. (ALJ Op. at 34.) Again, the testimony of Certification Supervisor and Certification Representative, which the ALJ found credible, provides substantial evidence to support the ALJ's findings.

Furthermore, it is irrelevant that Daycare subsequently took remedial steps to address some of the problems.[17] *Altagracia De Pena Family Day Care*, 943 A.2d at 356 ("Corrective action taken after a regulatory violation is irrelevant for purposes of determining whether a violation occurred."). As the ALJ found, the appropriate standard is whether there was a violation at the time of the inspection. Again, the credited testimony of the Certification Supervisor and Certification Representative establishes there was.

---

[17] As discussed below, several of the violations went unaddressed, despite the representations Daycare made in its POCs that they have been remedied.

The ALJ carefully reviewed the evidence presented and prepared a thorough, well-drafted opinion detailing the factual findings and explaining the recommendation. Daycare essentially asks this Court to disregard the ALJ's findings, including those related to credibility, but it is well established that "we may not review the credibility determinations of a fact-finder." *Nancy Hadlock's Family Child Care Home*, 103 A.3d at 858 (citation omitted). Because there was substantial evidence to support the findings of the violations, we hold the Department was justified in revoking Daycare's Provisional Certificate.

We note that the Department was also justified in revoking Daycare's Provisional Certificate for not submitting POCs or complying with the ones it did submit. The Department's regulations provide that the Department may revoke a certificate of compliance if the legal entity fails to submit an acceptable POC or fails to comply with an acceptable POC. 55 Pa. Code § 20.71(a)(3)-(4). Here, the Department's witnesses testified that Daycare did not submit POCs and presented evidence that Daycare did not comply with the POCs that it did submit. Given the detailed discussion of the evidence above, and the number of **repeat** violations found in the various LIS reports, there was evidence that Daycare did not comply with the acceptable POCs that it submitted. Further, Director presented no evidence that it did submit the missing POCs. These also provide reasons to revoke the Provisional Certificate. *Miller Home, Inc. v. Dep't of Pub. Welfare*, 556 A.2d 1, 3 (Pa. Cmwlth. 1989).[18]

Finally, Daycare also argues that it should have been issued a second provisional certificate because it was in substantial compliance with the regulations

---

[18] Because we find substantial evidence to support the ALJ's findings concerning violations of the regulations and that Daycare did not submit POCs or comply with the POCs it did submit, we need not reach the issue of whether Daycare engaged in gross negligence.

and a second provisional certification would have given it more time to come into compliance with the regulations. First and foremost, "there is no legal entitlement to a provisional certificate." *KC Equities v. Dep't of Pub. Welfare*, 95 A.3d 918, 931 (Pa. Cmwlth. 2014). "[A]ny provisional license beyond the first is discretionary." *Miller Home, Inc.*, 556 A.2d at 3 n.12. Second, Section 1008(a) of the Code and regulations provide for a provisional license only when there has been **substantial** compliance with all the applicable statutes, ordinances and regulations. 62 P.S. § 1008(a); 55 Pa. Code § 20.54(a). There is nothing in the Code or regulations that suggests provisional certificates should be issued to afford a means or grace period for a daycare to come into substantial compliance with the regulations. By their very terms, the Code and regulations provide that provisional certificates can only be issued when there already is substantial compliance. Based upon the number of violations found, several of which were cited multiple times, we cannot hold that the ALJ erred in refusing to find Daycare was in substantial compliance. *Lil Shining Stars, Inc. v. Dep't of Human Servs.*, 140 A.3d 83, 97 (Pa. Cmwlth. 2016); *Burroughs v. Dep't of Pub. Welfare*, 606 A.2d 606, 608 (Pa. Cmwlth. 1992).

*Burroughs* is illustrative of what does not constitute substantial compliance. There, the petitioner, who operated two daycares, challenged a refusal to issue a certificate of compliance and a cease and desist letter after multiple inspections revealed numerous violations at both facilities. During the first inspection of 1 daycare, there were 10 violations found. *Burroughs*, 606 A.2d at 607 n.1. At a subsequent inspection, there were at least 6 violations,[19] followed by 10 violations at the last inspection. *Id.* at 607 nn.1-2. At the second daycare, the hearing officer

---

[19] There was a second inspection in the interim, but the hearing officer made no specific findings as to how many violations were found during this inspection. *Burroughs*, 606 A.2d at 607.

found 14, 12, 6, and 18 violations, respectively, during 4 inspections. *Id.* at 607 n.3. On appeal, the petitioner argued she was entitled to a provisional certificate, as a matter of law, because the petitioner substantially complied with the regulations. We rejected the petitioner's argument, noting that "[t]he record before us indicates that the latest inspections of [the petitioner's] two facilities . . . revealed that the number of regulatory violations has either increased or remained constant since the time of the first inspection." *Id.* at 608. We additionally noted that "the record . . . indicates that at least one of those violations, that of maintaining proper staff[:]child ratios, was noted at seven of the eight inspections, including each of the two latest inspections. . . ." *Id.*

Similar to the appellant in *Burroughs*, Daycare, here, has not demonstrated substantial compliance with the Department's regulations. This is evidenced by the number of violations cited at each of the inspections and sustained by the ALJ: 12 in May; 8 in July; 9 in August; 5 in November; and 3 in December. Although the number of violations may have started to decrease, like *Burroughs*, a number of the violations were cited multiple times, including four times for violating the regulation related to compliance with the CPSL; three times for violating the regulation related to staff qualifications; two times for violating the regulation related to assistant group supervisor qualifications; three times for violating the regulation related to staff:child ratios; five times for violating the regulation related to supervision of children; two times for violating the regulation related to staff health assessments; and three times for violating the regulation related to staff clearances. (ALJ Op. at 51.) The repeat violations do not show Daycare was in substantial compliance; rather, they demonstrate Daycare continued to be noncompliant with Department regulations despite being on notice from prior inspections that those areas were an

18

issue and submitting two POCs incorrectly stating these issues had been addressed. Thus, we cannot find that the Department abused its discretion in refusing to issue a second provisional certificate when Daycare remained out of compliance with a number of regulations.

## III. Conclusion

In summary, there is substantial evidence to support the ALJ's findings that Daycare violated a number of Department regulations, some of which Daycare admitted to violating. In addition, the record demonstrates that Daycare did not comply with the POCs it did submit and failed to submit other POCs, as required. These violations are sufficient to revoke Daycare's Provisional Certificate. Furthermore, because Daycare did not establish that it was in substantial compliance with the Department's regulations, the Department did not abuse its discretion in refusing to issue a second provisional certificate. Accordingly, the January 10, 2018 Order is affirmed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tullis's Little Lamb Daycare,      :
                     Petitioner   :
                                 :
           v.                   :   No. 164 C.D. 2018
                                 :
Department of Human Services,    :
                     Respondent  :

# **O R D E R**

**NOW**, March 6, 2019, the Order of the Department of Human Services, Bureau of Hearings and Appeals, dated January 10, 2018, is **AFFIRMED.**

_____
**RENÉE COHN JUBELIRER,** Judge