# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lil Shining Stars, Inc.,         :
            Petitioner         :
                              :    No. 693 C.D. 2015
                              :
            v.                      :
                              :    Submitted: January 22, 2016
Department of Human Services,    :
            Respondent       :


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
JUDGE McCULLOUGH                                 FILED: June 8, 2016


       Lil Shining Stars, Inc. (Petitioner) petitions for review of the March 31, 2015 order of the Chief Administrative Law Judge for the Department of Human Services (Department), Bureau of Hearings and Appeals (Bureau), adopting in its entirety the recommendation of an Administrative Law Judge (ALJ) to deny Petitioner's appeal from the Department's revocation of its certificate of compliance to operate a child care center.

       Petitioner was a group child care home with a certificate of compliance located at 3880 Glendale Street, Philadelphia, Pennsylvania, and was owned and operated by Regina (nee Guyton) Thompson (hereafter Owner). On September 27, 2012, a Department certification representative and her supervisor arrived for an unannounced inspection of Petitioner's facility. A worker at the facility initially refused entry because Owner was not home. The inspection team informed the worker that they needed access and the worker responded that she was going to call

Owner. After a few minutes, the worker opened the door and allowed the inspection team access to the facility.[1] (ALJ's Findings of Fact Nos. 1-2.)

On October 2, 2012, two representatives of the Department, accompanied by two police officers, conducted another unannounced inspection of the facility. The Department representatives identified three staff persons at the facility, including Owner, her mother, and her sister. During the inspection, the Department representatives noted multiple regulatory violations, including, *inter alia*, leaving a child in a highchair for an extended period of time with no contact by staff; documentation missing from staff members' files; an open and accessible window; an uncovered electrical outlet in the child care space; an accessible bottle of hand sanitizer; lack of a written plan of daily activities and routines; missing emergency contact information in children's files; lack of an emergency shelter plan; and two recalled highchairs.[2] (ALJ's Findings of Fact No. 3.)

By letter dated October 16, 2012, the Department notified Owner of each of the regulatory violations found during the October 2 inspection and requested that Petitioner complete a plan of correction. Petitioner submitted two plans of correction, each of which the Department rejected as unacceptable. After further discussions, the Department and Owner reached an oral agreement as to an acceptable plan of

---

[1] Nevertheless, as will be discussed below, the Department certification representative and her supervisor never completed the inspection.

[2] When told of the violation relating to the unattended child in a highchair, Owner immediately removed the child from the chair and placed her on the floor. When told of the violation relating to the recalled highchairs, Owner immediately placed the chairs in the trash.

2

correction for Petitioner's facility. The Department then forwarded a written draft of the agreement to Owner, but she refused to sign.[3] (ALJ's Findings of Fact Nos. 4-8.)

On December 3, 2013, a Department early learning program representative and certification representative supervisor conducted a third, unannounced inspection of the facility. During this inspection, Department representatives again noted multiple regulatory violations, including, *inter alia*, missing documentation, including required clearances, in staff member files; seven uncovered electrical outlets in the child care space; an accessible window in the child care space; nails protruding from the wall in the child care space; a broken toy that created a pinch point for a child; an unlabeled bottle; and lack of proof of insurance for the facility. (ALJ's Findings of Fact No. 9.)

On January 3, 2014, the Department sent Owner a notice revoking Petitioner's certificate of compliance. Owner thereafter filed a notice of appeal and the matter was assigned to the ALJ. From July to December 2014, the ALJ conducted five administrative hearings and heard testimony from seven witnesses, including Owner; Kya Thompson, an Early Learning Program Representative from the Department's Office of Child Development and Early Learning (OCDEL); Asia Sheppard, a Certification Representative Supervisor for OCDEL; Don Jackle, a retired Certification Representative Supervisor for OCDEL; Amanda Dorris, former Chief, Division of Regulatory Administration, OCDEL; Tania Schultz, a Certification Representative for OCDEL; and Carmen Martin, Regional Director, Southeast Region, OCDEL. The ALJ further admitted numerous exhibits into the record from both parties. (ALJ's Findings of Fact Nos. 10-11.)

---

[3] Owner would later testify that the written agreement was substantially different from the oral agreement reached by the parties.

Owner testified she lives at 3880 Glendale Street, Philadelphia, Pennsylvania, in a 1,200 square foot home which consists of Petitioner's facility on the first and second floors and her living space on the third floor. Owner stated that she graduated high school, attended classes at both a community college and the Wharton School of Business, and also attended some continuing education courses. Owner said that she opened her business in 2003 and that she has employed her two sisters and her mother since that time.[4] Owner noted that she never had any compliance issues with inspections through 2011. However, Owner testified that she began having problems with the Department in 2009, including confusion over the number of different offices, both state and local, that she was required to deal with and the different information she received, prompting her to make complaints to the Department and visit the regional office. Following her most recent complaints regarding unfair treatment over violations notices posted on a website maintained by the Department and accessible to the public, as well as the filing of a complaint against Regional Director Martin with the Office of Attorney General, Owner indicated that the Department conducted its first unannounced inspection in September of 2012. (N.T., 11/21/14, pp. 96-130.)

Owner recalled receiving a phone call from her mother on her way to the store on September 27, 2012, regarding the arrival of two women at the facility to conduct an inspection. She testified that she instructed her mother to allow the women into the facility and that the women were inside when she returned. Owner stated that she asked why she was being inspected at that time when she was just

---

[4] Owner stated that her mother dropped out of school in 10th grade and later attended GED classes and received a certificate, but has not sat for the actual GED test. (Notes of Testimony (N.T.), 11/21/14, p. 117.) Owner noted that it was her understanding that a secondary staff person was only required to have a minimum of an 8th-grade education. *Id.* at 118.

4

inspected in June of 2012, and whether it was in response to her filing of a complaint, at which point the women exited the facility to make a call. As the women were exiting, Owner informed them that she was calling her attorney, the police, and a few parents. Owner noted that the women left without conducting an inspection, after which she wrote letters to the Philadelphia Daily News, her Congressman and State Senator, Reverend Al Sharpton, and Deputy Secretary Barbara Metzinger, voicing her complaints and alleging that certain Department officials manipulate the rules to their advantage. (N.T., 11/21/14, pp. 137-42.)

Owner also recalled the October 2 inspection conducted by Jackle, as he had assisted her in the past. She noted that Jackle and another individual waited outside for two police officers to arrive before proceeding inside. She described one of the police officers as being nasty and threatening toward her and stated that both officers searched her entire house, including her private residence on the third floor. She insisted that she overheard Jackle on the phone with Regional Director Martin, with Martin advising Jackle to find anything he could. Owner noted that the inspection took four hours, whereas they normally take forty-five minutes to an hour. She also noted that she placed two highchairs in the trash after she was advised by one of the Department's representatives that the chairs had been recalled. Owner then proceeded to dispute each of the violations found by the inspectors. (N.T., 11/21/14, pp. 143-82.)

Owner testified that her attorney at the time prepared and submitted plans of corrections to the Department, but the Department rejected the same. Owner stated that she obtained new counsel and was able to reach an oral agreement with the Department regarding correction of four outstanding issues. However, Owner said that she later refused to sign a written agreement meant to memorialize the terms of

the oral agreement because it was completely different from what she agreed to. Following this refusal, on December 3, 2013, Owner noted that the Department sent Thompson to conduct a third, unannounced inspection of the facility. Owner then proceeded to dispute each of the violations found during this inspection, many of which were included on the previous inspection summary and for which she believed she had provided adequate supporting documentation to the Department. (N.T., 11/21/14, pp. 182-206.)

Subsequent to this inspection, Owner testified that she sent a letter to Thompson disputing Thompson's observations/violations and requesting that Thompson meet with her and her attorney to discuss the same. However, Owner stated that her counsel was advised her request for a meeting was denied, after which the Department initiated proceedings to revoke Petitioner's certificate of compliance. (N.T., 11/21/14, pp. 206-07.)

On cross-examination, Owner insisted that she attended the necessary training and received a certificate necessary for her re-entry into the Department of Education's child/adult food subsidy program, despite numerous questions raised by counsel for the Department regarding her attendance. Owner conceded that during the September 27, 2012 inspection, there was a period of time that her mother was left alone to watch the children in the daycare when she ran to the store. While the files failed to indicate that her mother had first-aid training, Owner testified that all employees, including her mother and her sister, as well as her husband who occasionally assists her and was present at the facility at the time, had first-aid training. Owner also alleged that Department representatives had taken documentation evidencing this training. (N.T., 11/21/14, pp. 222-56.)

6

Owner further conceded that there were times when she had to leave her mother with the children at the facility in order to pick up other children from a school bus. Owner stated that she brought this issue up in one of her complaints to Regional Director Martin. Owner reiterated that her sister or her husband, both of whom she considered staff members, would often be at the facility when she was not there. Owner noted that many of her purported violations were corrected onsite, immediately after she was notified of the same. Owner refused to acknowledge that she left any toxic substances, including hand sanitizer, in areas accessible to children in her care. (N.T., 12/9/14, pp. 16-36.)

The Department first presented the testimony of Thompson, an Early Learning Program Representative from the OCDEL. Thompson testified that she conducted the December 3, 2013 unannounced inspection of the facility along with her supervisor, Sheppard. Thompson stated that Owner, as well as Owner's mother and husband, were present at the time of the inspection. Thompson identified an inspection summary she completed following the inspection and proceeded to discuss each of the fourteen regulatory violations she found and the reasons underlying the same. Thompson specifically denied ever being asked or coerced into finding violations against the facility; rather, she noted that she personally observed each of the violations. (N.T., 10/22/14, pp. 27-58.)

On cross-examination, Thompson acknowledged that the bulk of the violations present during the October 2, 2012 inspection were not present during the December 3, 2013 inspection. Thompson also conceded that her inspection summary reveals that the Department accepted a plan of correction for each of the fourteen regulatory violations. On re-direct examination, Thompson testified that the fact that a plan of correction is accepted does not negate the existence of the violation.

7

Thompson stated that, with the exception of new employees, the failure to maintain employee documentation in their respective files at all times constitutes a violation. (N.T., 10/22/14, pp. 78-103.)

The Department next called Thompson's supervisor, Sheppard, to testify. The parties stipulated that Sheppard would testify that she observed the same violations as Thompson during the December 3, 2013 inspection. Sheppard testified briefly regarding the physical/health assessment records that are required to be maintained in each employee's file, including whether a physical was performed and whether the employee had any communicable diseases, such as tuberculosis. Sheppard stressed that such records are required to be on file at all times. Counsel for Owner did not cross-examine Sheppard. (N.T., 10/22/14, pp. 107-14.)

Jackle next testified that he retired from the Department in May of 2013, having worked for the preceding twelve years as a Certification Representative Supervisor for OCDEL. He described himself as an annuitant, i.e., a retired employee who returns for some temporary work with the Department. Jackle stated that he conducted the October 2, 2012 unannounced inspection of the facility along with another Department representative, Steven Jones, and two police officers. Jackle noted that he was advised to contact the police because there had been a previous issue of the Department being denied access to the facility. Jackle identified an inspection summary he prepared following the October inspection, which lasted for approximately five hours. (N.T., 10/22/14, pp. 116-26.)

Jackle proceeded to discuss each of the twenty-four regulatory violations contained in his summary and the reasons underlying the same, as well as Petitioner's twice-submitted plans of correction and the Department's rejection of these plans. He later clarified that the Department accepted certain corrections offered by

8

Petitioner, but he was not aware if the corrections were actually completed. Finally, he discussed OCDEL's process for revoking a facility's license, noting that the matter is first discussed locally with inspection staff and the regional director and then the matter is forwarded to the Department's main office in Harrisburg where a final determination is made. Jackle testified that he would estimate that a minimum of three individuals review a denial recommendation before any final action is taken. (N.T., 10/22/14, pp. 126-177; N.T., 10/29/14, pp. 10-26.)

On cross-examination, Jackle testified that Martin, his direct supervisor, directed him to conduct the October 2, 2012 inspection and advised him to bring police with him due to prior problems with gaining access to Petitioner's facility. Jackle acknowledged that Owner approached him on the sidewalk and invited him in prior to police arriving at the facility. Jackle noted that the police officers were only present for the first hour or two of the inspection and remained outside in the porch area of the facility. Jackle stated that he did not recall placing a call to Martin after he gained access to the facility and denied any knowledge of a June 2012 inspection. He did indicate that Owner was required to abide by a handbook of regulations that included approximately 200 individual regulations. (N.T., 10/29/14, pp. 26-41.)

Counsel for Owner then addressed multiple prior violations which Jackle conceded were not present during his inspection. Jackle further admitted that Owner corrected at least one of the violations on the day of the inspection, that he could not recall why the majority of Petitioner's plans of correction were rejected, and that he never returned to the facility to check if other corrections had been implemented. (N.T., 10/29/14, pp. 44-125.)

On re-direct examination, Jackle reiterated that the police officers remained outside of the facility and were never in the same room with the children.

9

Jackle testified that the children did not appear to be upset during his inspection. Jackle also stated that the fact that a violation was corrected, or a plan of correction was accepted, does not negate the violation, even if he was to observe the same during a follow-up visit. (N.T., 10/29/14, pp. 125-33.)

Dorris next testified that she had served as Chief of OCDEL's Division of Regulatory Administration for a period of six years, during which time she reviewed sanction referrals relating to child care providers/facilities that received multiple violations. Dorris stated that the referrals are transmitted by the regional offices, after a discussion between the certification representative, his/her supervisor, and the regional director. She then discusses the matter with OCDEL's legal counsel and either she or her staff draft an enforcement letter, which is forwarded to the deputy secretary for her signature. By the time it reaches this stage, Dorris noted that the matter has been reviewed by at least seven different individuals. Dorris also noted that she rejected revocation referrals during her tenure. (N.T., 10/29/14, pp. 136-44.)

Dorris specifically recalled that matter involving Petitioner, as she received the revocation referral and may have actually drafted the revocation. She testified that she believed the facts of the matter warranted revocation of Petitioner's certificate of compliance, especially in light of Petitioner's repeated violations and its failure to provide an acceptable plan of correction for the bulk of its violations. Dorris stated that OCDEL requested three plans of correction in this case, all of which were rejected as unacceptable. (N.T., 10/29/14, pp. 144-56.)

On cross-examination, Dorris testified that the decision to revoke is based on criteria found in applicable statutes and Department regulations. Dorris noted that an acceptable plan of correction would be one where a provider shows how

it would achieve and maintain compliance with Department regulations. When questioned about a recalled highchair, Dorris explained that throwing the highchair in the trash was not an acceptable correction, that Petitioner would have to state how it will ensure that a child does not use a recalled highchair in the future, e.g., by routinely checking the consumer product safety recall list. Dorris could not recall if she discussed Petitioner's revocation with staff in the local office. Dorris noted that Petitioner had at least nine repeat violations in the 2013 inspection, which would justify a revocation based on gross incompetence, negligence, and misconduct. (N.T., 10/29/14, pp. 156-67.)

The Department next presented the testimony of Schultz, a certification representative for OCDEL who, along with her supervisor Julie Merit, was to conduct the September 27, 2012 unannounced inspection of Petitioner's facility. Schultz testified that she and Merit knocked on the door of the facility, that a caregiver partially opened the door, and that they identified themselves and the purpose of their visit. Schultz stated that the caregiver informed them Owner was not home and shut the door, only to briefly reopen the door to advise them that she was calling Owner. Schultz noted that the caregiver eventually opened the door after a few minutes. Shortly thereafter, Schultz said that Owner called the facility to speak with her, that Owner was upset and angry, questioning why they were there, and asserting they had no business being there, after which she handed the phone to Merit. Upon completion of the call, Merit instructed Schultz that they would wait outside for Owner to arrive. (N.T., 11/21/14, pp. 11-15.)

Schultz testified that Owner was still upset and angry when she arrived back at the facility, again questioning why they were there. Schultz explained to Owner that she and Merit were there for an unannounced inspection and not in

response to a complaint as Owner appeared to believe. Schultz stated that Owner then began making statements about Martin and Martin's desire to shut down innocent providers. Schultz noted that a parent arrived at the scene and Owner advised that the parent was present to observe their office's "dirty work." Schultz said that after a few more people started to gather around them, she and Merit advised Owner that they needed to contact the office and began walking back to their car, only to be followed by Owner and the group of people. Schultz characterized her feelings at that time as unsettled, nervous, and frightened. Schultz noted that after Merit spoke with someone at the office, Merit informed Owner they were not going to conduct an inspection and she and Merit got back in their car and returned to the office. Schultz testified that Owner proceeded to demand that they come back inside and complete the inspection in front of everyone present. Schultz denied any perceived bias against Owner by anyone at OCDEL or that she was coerced or asked to fabricate violations against Petitioner/Owner. (N.T., 11/21/14, pp. 16-27.)

On cross-examination, Schultz admitted that she and Merit were eventually allowed access to the facility and were there long enough for the caregiver to identify the children that were present. Schultz denied that Owner later invited her and Merit back into the building to conduct the inspection, reiterating that Owner demanded that they return and conduct the inspection in front of all the individuals present at the facility. Schultz noted that she prepared a report following the incident and forwarded the report to human resources in Harrisburg. (N.T., 11/21/14, pp. 27-34.)

The Department then presented its final witness, Martin, Regional Director of the Southeast Region for OCDEL. Martin explained the role of OCDEL and her duties as manager of an office that overseas approximately 3,100 facilities in

12

her region. Martin testified that she first came into contact with Owner in early September of 2012 when Owner arrived at the office to file a complaint regarding a subsidy coordinator who worked in another office. Martin stated that Owner accused her of closing down facilities, not being a nice person, and harmful to children. Martin later discovered that her office had previously investigated and verified a complaint filed against Petitioner by the subsidy office regarding the capacity of Petitioner's facility. Martin stated that the September 27, 2012 unannounced investigation was to ensure that Petitioner had corrected the capacity issue. Martin recalled talking to Merit that day and advising her to return to the office, which prompted the request for police presence during the next inspection. Martin noted that the decision to request that police accompany an inspector is based on a variety of factors, including prior inspection experience, and involves a discussion with staff and legal counsel. (N.T., 11/21/14, pp. 38-47.)

Martin next discussed the revocation process, which begins with the certificate representative and, at times, a supervisor. She testified that the failure to remediate violations can be a basis for revocation and that a provider is generally permitted three attempts to develop an acceptable plan of correction, although the regulations allow the Department to proceed with a revocation after just two attempts. She noted that a decision to revoke can be premised on a single violation. Martin explained that the decision to revoke starts with her and her staff and involves multiple people and levels of review, including the Division of Regulatory Administration in Harrisburg, the Bureau director, the Office of Legal Counsel, and the Department's Deputy Secretary. (N.T., 11/21/14, pp. 48-51.)

On cross-examination, Martin testified that the decision to request that police accompany an inspector is made by her, the Bureau director, and the Office of

13

Legal Counsel. Martin stated the police presence was requested for the October 2, 2012 inspection because of the experience of Schultz and Merit during the September 27, 2012 inspection. Martin acknowledged that her staff had no issue with access to Petitioner's facility during the October and December inspections. Martin said that, when she first met with Owner, Owner wished to file a complaint against an individual with the subsidy office, that she explained she had no oversight of that office, and that she recommended that Owner put her concerns in writing, but she never received the same. Martin noted that it was her understanding that the police would remain onsite for the entire inspection and not participate in the inspection. Martin specifically denied ever being disciplined for her actions toward Owner in this matter. Martin also denied that she favored suburban owners of daycare centers or had knowledge of any newspaper investigating such an allegation. (N.T., 11/21/14, pp. 51-80.)

On re-direct examination, Martin testified that prior to September 27, 2012, Petitioner had overlapping enrollment where there were more than the permitted twelve children present in the facility. Martin reiterated that this issue precipitated the September inspection. Martin further explained that applicable statutes and regulations permit both announced and unannounced inspections of childcare facilities. (N.T., 11/21/14, pp. 90-91.)

The ALJ thereafter issued an adjudication recommending that Petitioner's appeal from the Department's revocation of its certificate of compliance to operate a child care center be denied. The ALJ concluded that the Department had proved that Petitioner violated multiple Department regulations and, hence, the Department properly exercised its discretion to revoke Petitioner's certificate of compliance. In his adjudication, the ALJ separately reviewed each of the thirty-eight

14

violations identified by Department representatives in both the October 2, 2012, and December 3, 2013 inspection summaries and found that the Department had presented sufficient evidence establishing thirty-one of these violations. The ALJ noted that the Department's subsequent acceptance of a plan of correction does not negate the underlying violation. The ALJ rejected Owner's claims that the Department initiated the inspections in retaliation for her attempt to file a complaint against a Department official and that the October 2, 2012 inspection constituted an unlawful and unconstitutional search and seizure. Finally, the ALJ noted that Petitioner's lack of violations prior to the October 2, 2012 inspection carried no weight in these proceedings. By order dated March 31, 2015, the Bureau's Chief Administrative Law Judge adopted the ALJ's recommendation in its entirety. Petitioner thereafter filed a petition for review with this Court.

On appeal,[5] Petitioner argues that the inspections conducted by the Department/OCDEL were unconstitutional. We disagree.

Section 1016 of the Public Welfare Code (Code), Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §1016, provides the Department with the right to enter and inspect a licensed premises. This section states that:

> For the purpose of determining the suitability of the applicants and of the premises or whether or not any premises in fact qualifies as a facility as defined in section 1001 of this act or the continuing conformity of the licensees to this act and to the applicable regulations of the department, any authorized agent of the department shall

---

[5] Our scope of review in an appeal of an adjudication of the Department is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact were supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *KC Equities v. Department of Public Welfare*, 95 A.3d 918, 925 (Pa. Cmwlth. 2014).

have the right to enter, visit and inspect any facility licensed or requiring a license under this act and shall have full and free access to the records of the facility and to the individuals therein and full opportunity to interview, inspect or examine such individuals.

An authorized agent of the department shall also confer with the operators of facilities regarding the minimum standards of the department, encourage the adoption of higher standards and recommend methods of improving care and services.

62 P.S. §1016.

The Department's regulations expound upon this statutory authority. Sections 20.31 and 20.32 of the regulations provides that an authorized agent of the Department, such as the OCDEL in this case, will conduct an annual inspection of a facility and that the facility will be provided with advanced notice of this inspection. 55 Pa. Code §§20.31, 20.32. Section 20.33 of the regulations states that a facility will be subject to both announced and unannounced inspections, including complaint inspections. 55 Pa. Code §20.33. Additionally, section 20.34 requires a facility to provide the Department with "full access to the facility or agency and its records during both announced and unannounced inspections" as well as "the opportunity . . . to privately interview staff and clients." 55 Pa. Code §20.34. Section 3280.23 further discusses the Department's inspection process, providing as follows:

(a) A staff person shall provide to agents of the Department immediate access to the facility and, upon request, to the children and the files and records.

(b) An inspection will be conducted during normal business hours except when there is reasonable cause to believe that inspections at other times are necessary to detect violations of applicable statutes and regulations.

> (c) An agent of the Department will inspect compliance with this chapter in all areas of the facility premises that are accessible to children.

55 Pa.Code §3280.23(a)-(c). Further, the Department may revoke a facility's certificate of compliance for even a single violation of its regulations. Section 3290.12(c) of the Department's regulations, 55 Pa. Code §3290.12(c);[6] *Altagracia De Pena Family Day Care v. Department of Public Welfare*, 943 A.2d 353, 356 (Pa. Cmwlth. 2007) ("It is well settled that one regulatory violation is sufficient to revoke a license issued by DPW....").

Petitioner's argument focuses exclusively on the Fourth Amendment to the United States Constitution, which guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

---

[6] Section 3290.12(c) states that the Department may revoke a certificate of compliance for one or more of the following reasons:

> (1) Noncompliance with the registration law or this chapter.
> (2) Fraud or deceit in the self-certification process.
> (3) Lending, borrowing or using the certificate of another operator, or in any way knowingly aiding the improper issuance of a certificate of registration.
> (4) Gross incompetence, negligence or misconduct in operating the facility.
> (5) Mistreating or abusing children cared for in the facility.
> (6) Failure to submit to the Department an acceptable plan to correct noncompliance.
> (7) Failure to comply with the acceptable plan to correct noncompliance.

55 Pa. Code §3290.12(c)(1)-(7).

and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Petitioner correctly notes that our United States Supreme Court has long recognized that "the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes." *New York v. Burger*, 482 U.S. 691, 699 (1987). While Petitioner admits that it is engaged in a commercial activity that is heavily regulated, Petitioner contends that the existence of statutes granting a governmental entity the right to conduct an administrative inspection "does not automatically fulfill the Fourth Amendment's 'reasonableness' requirement, or always excuse the need for a warrant." (Petitioner's brief at 17.)

Petitioner suggests that there must be a heightened concern for the reasonableness requirement of the Fourth Amendment where, as here, a statute authorizes administrative inspections but the governmental entity, i.e., the Department, has no policies or procedures that direct its employees on the procedure to be followed during said inspections. Furthermore, Petitioner contends that the statute and the governmental entity's actions "must limit the discretion of the inspecting officers," especially in regard to "time, place, and scope." *Burger*, 482 U.S. at 703 (quoting *United States v. Biswell*, 406 U.S. 311, 315 (1972)). We do not disagree with Petitioner as to the overall importance of the "reasonableness" requirement of the Fourth Amendment or the need for some limitation on the discretion of inspecting officers; however, we do disagree with Petitioner insofar as it alleges that the statute and regulations discussed above fail to ensure such "reasonableness," fail to limit the discretion of inspecting officers, and are *per se* unconstitutional.

As noted above, Petitioner admits that it is engaged in a commercial activity that is heavily regulated. Petitioner does not contest the need for such regulation in an industry entrusted with the care of children. Indeed, in a recent unpublished opinion affirming the Department's order refusing to renew a certificate of compliance for a day care facility, this Court stated that "[t]here is no question that the purpose underlying the provisions of the Public Welfare Code and DPW regulations . . . were enacted for the purpose of protecting the health and safety of the children of the Commonwealth who enter day care facilities, and that this is a legitimate and valid objective." *The Preschool Academy, Inc. v. Department of Public Welfare* (Pa. Cmwlth., No. 484 C.D. 2014, filed December 30, 2014), slip op. at 13.[7]

Contrary to Petitioner's arguments, the statutory and regulatory provisions discussed above do not infringe on Petitioner's right to be free from an unreasonable search under the Fourth Amendment, but rather balance the government's need to protect these children with the extent of access necessary to ensure the same, including specific limitations on the time, place, and scope of a government inspection. More specifically, section 1016 of the Code provides the necessary authority to the Department or its agent to visit and inspect any licensed facility, including full access to the facility's records and staff. The regulations then advise licensed facilities that in addition to an announced annual inspection, they also may be subject to unannounced inspections. However, the regulations generally limit such inspections to normal business hours with a limited exception for inspections

---

[7] Pursuant to Commonwealth Court Internal Operating Procedure 414(a), 210 Pa. Code §69.414(a), an unreported Commonwealth Court panel decision issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent.

during non-business hours when the Department believes that the facility may be attempting to conceal violations. Additionally, the regulations restrict the scope of an inspection to the areas that would be accessible to children.

Further, it is presumed when construing a statute that the legislature did not intend to violate either the United States or Pennsylvania Constitutions. Section 1922(3) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1922(3); *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306, 1312 (Pa. 1985). The party challenging the constitutionality of a statute bears the heavy burden of establishing that the statute clearly, palpably and plainly violates the Constitution, with any uncertainty being resolved in favor of its validity. *Reiter v. Commonwealth*, 525 A.2d 446, 449 (Pa. Cmwlth.), *appeal denied*, 534 A.2d 770 (Pa. 1987). Petitioner simply cannot meet such an elevated burden in this case.

First, as discussed above, the Department's regulations adequately limit the time, place, and scope of an inspection. More importantly, this Court has previously refused to extend the protections of the Fourth Amendment to other situations involving highly regulated industries. *See*, *e.g.*, *Holmes Constant Care Center v. Department of Public Welfare*, 555 A.2d 282 (Pa. Cmwlth.), *appeal denied*, 562 A.2d 828 (Pa. 1989) (denying renewal of license to operate a personal care home); *Peterson v. Pennsylvania State Horse Racing Commission*, 449 A.2d 774 (Pa. Cmwlth. 1982) (affirming ejection of vendor from a horse racing track for carrying a firearm onto track grounds).

In *Holmes Constant Care Center*, we concluded that a personal care home whose license was not renewed because of the facility's lack of compliance with the applicable statute and regulations failed to cite any authority in support of its position that the protections of the Fourth Amendment applied "where a licensed

entity consents, either impliedly or expressly, to periodic inspections of its premises." 555 A.2d at 285. In *Peterson*, we noted that the horse racing industry was widely known to be highly regulated and concluded that an individual vendor's entry into a restricted area of a horse racing track, even without a valid license,[8] constituted implied consent to a warrantless search of his person and premises consistent with the regulations of the Pennsylvania State Horse Racing Commission as well as a waiver of his Fourth Amendment protections. Again, Petitioner admits that it is engaged in a commercial activity that is heavily regulated and the applicable statutory and regulatory provisions are clear that Petitioner is subject to inspections, both announced and unannounced. Hence, Petitioner's constitutional arguments must fail.[9]

We note that, in the course of this argument, Petitioner places heavy emphasis on the presence of police officers and their purported simultaneous search of the facility on October 2, 2012, including a search of the private living area of Owner and her family, at the direction of Department representatives. However, Jackle explained that the presence of the police officers was requested due to a previous issue regarding access to the facility and that once he and Jones gained access, the police officers waited outside on the porch of the facility. In addition, Martin similarly explained that a police presence was requested due to the initial denial of access during the September 27, 2012 inspection and the situation that

_____

[8] The vendor had obtained a vendor's license in 1979 and 1980 but never obtained a valid license for 1981 when the firearm was found in his vehicle.

[9] In light of this conclusion, we need not reach Petitioner's argument that any evidence of regulatory violations discovered by the Department's representatives should be excluded from evidence and the enforcement action enjoined because the inspections were unconstitutional and unlawful.

21

developed subsequent to Owner's arrival at the facility on that day. During her cross-examination, Martin further stressed that the Department does not regulate, supervise, or have any jurisdiction over police officers, that the Department did not ask the officers to participate in the October 2, 2012 inspection, and that their presence was required simply to ensure the inspectors had no problem gaining access to the facility. *See* N.T., 11/21/14, pp. 57-58, 73. Hence, any purported actions of the police officers are not relevant to this case and the determination of whether the Department established sufficient grounds justifying the revocation of Petitioner's certificate of compliance to operate a child care center.

Petitioner also argues that the Department's inspections constituted an impermissible retaliation against Owner for the exercise of her First Amendment rights in seeking to file a complaint against a Department official. Again, we disagree.

As Martin explained in her testimony, the official against whom Owner sought to file a complaint worked with a different office, one that oversaw a food subsidy program, and not with OCDEL, which conducted the inspections. Martin also explained that the initial investigation in September 2012 was prompted by a complaint from the subsidy office regarding the number of children at Petitioner's facility, which the Department had verified was in excess of the limit of twelve children. As noted above, section 20.33 of the Department's regulations advises that a licensed facility will be subject to both announced and unannounced inspections, including complaint inspections. Further, the record reveals that multiple investigations were necessary as a result of the actions of Petitioner's staff, including Owner, and numerous repeated violations of the same regulations which Petitioner failed to correct to the satisfaction of the Department.

22

Finally, Petitioner argues that it was entitled to a provisional license pursuant to section 1008 of the Code, 62 P.S. §1008, because it made timely corrections to the noted violations and was in substantial compliance with the Department's regulations. Once more, we disagree.

Section 1008 states that:

(a) When there has been substantial but not complete compliance with all the applicable statutes, ordinances and regulations and when the applicant has taken appropriate steps to correct deficiencies, the department shall issue a provisional license.

(b) The department may issue a provisional license under this section when it is unable to assess compliance with all statutes, ordinances and regulations because the facility has not yet begun to operate.

(c) A provisional license shall be for a specified period of not more than six months which may be renewed no more than three times.

(d) Upon full compliance by the facility, the department shall issue a regular license immediately.

62 P.S. §1008(a)-(d).[10]

Petitioner relies on the testimony of Owner stating that all of the alleged violations were corrected either on the spot or immediately thereafter in the form of a corrective plan submitted to the Department. However, Petitioner neglects that many of the violations found during the December 3, 2013 inspection were repeat violations and that the Department rejected Petitioner's three proposed plans of correction. In such cases, this Court has found a lack of substantial compliance

---

[10] Section 20.54(a) of the Department's regulations similarly provides that "[a] provisional certificate of compliance is issued if the facility or agency is in substantial, but not complete, compliance with applicable statutes, ordinances, and regulations." 55 Pa. Code §20.54(a).

23

sufficient to warrant the issuance of a provisional license. *See Burroughs v. Department of Public Welfare*, 606 A.2d 606 (Pa. Cmwlth. 1992). In *Burroughs*, we noted that the number of violations at the petitioner's facility had either increased or remained constant since the time of the first inspection, including at least one violation that was present at seven of the last eight inspections. Hence, we concluded that the petitioner had not demonstrated the substantial compliance necessary to be issued a provisional license. We reach the same conclusion in this case.

We note that Petitioner asserts that the vast majority of violations found by the Department were ministerial in nature, such as missing paperwork, and did not pose an immediate threat of danger to the children at its facility. Petitioner also asserts that the Department maintains over 400 regulations and that no single proprietor could reasonably be expected to be in compliance with every regulation. However, Petitioner provides no authority to support how these assertions would justify a finding of substantial compliance. Petitioner opted to engage in an industry that is heavily regulated. Certainly, we would not expect Petitioner or any other entity in this particular industry to maintain 100% compliance at all times during their respective operations, but the fact remains that Petitioner received notice of its violations, many of which continued from a previous inspection, and its submitted plans of correction were rejected by the Department on three separate occasions.

Accordingly, the order of the Bureau must be affirmed.


_____
PATRICIA A. McCULLOUGH, Judge

24

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lil Shining Stars, Inc.,        :
            Petitioner     :
                             :   No. 693 C.D. 2015
            v.               :
                             :
Department of Human Services,   :
            Respondent    :

## *ORDER*

AND NOW, this 8th day of June, 2016, the order of the Chief Administrative Law Judge for the Department of Human Services, Bureau of Hearings and Appeals, dated March 31, 2015, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge